CHEON SU KIM, Plaintiff

v.

STAR-KIST SAMOA, Inc., YOUNG KWANG
FISHERIES Co., M/V # 25 TAE CHANG, and
DOES 1-10, Defendants

High Court of American Samoa
Trial Division

CA No. 103-87

January 12, 1988

Before KRUSE, Associate Justice, AFUOLA, Associate
Judge, and VAIVAO, Associate Judge.

Counsel: For Plaintiff, William Reardon
 For Defendants, Togiola T.A. Tulafono

Plaintiff, a seaman off one of the fishing vessels anchored at defendant Star-Kist Samoa, Inc.'s dock, sues in damages for personal injuries sustained when run over by one of defendant's fork lifts operating on the dock.

12

Defendant's dock runs parallel with its shoreline facilities to which fishing vessels tie up to unload their catch. The unloading process utilizes standardized scows which are moved by fork lifts in and about the facilities. Empty scows are stacked to the edge of the wharf on the sami side for ready access with unloading, while at the same time, scows filled with fish could be variously stacked to the opposite side for thawing and receiving by the processing system. On the day in question, scows were variously stacked on both sides of the dock and these stacks in places were at least two wide and two high. Accordingly some restrictions in movement resulted. Testimony had it that movement at places was about a 9 foot corridor although generally there was room enough for 3 forklifts to manuever comfortably from opposing directions on the day of the accident.

At around 2:30 p.m. in the afternoon of April 20, 1987, and prior to a change in shift, plaintiff was walking along the shoreline side of the dock towards his vessel. He crossed the dock and continued walking along the sami side and then stopped to talk to someone, or some persons, aboard one of the vessels tied alongside the dock.

At the same time one Tesimoni, employed by defendant Star-Kist as a fork lift operator, was following in plaintiff's direction with a scow loaded with trash which was being taken to a staging area. The scow contained a cardboard box protruding over the top by some 18 inches. According to the driver, this box did not affect his view of the dock and he had no idea how the accident occurred until the rear end tires of the forklift felt as though having run over something. The driver stopped his vehicle and saw plaintiff's legs extending from underneath the back of the forklift with his upper body under the forklift itself. The accident as he pointed out occurred just beyond one of the stacked rows of empty scows alongside the same side of the dock. He estimated his speed at about 3 miles per hour as he was deliberately taking his time with this last movement owing to the fact that he was about to end his shift. The driver expressed puzzlement with how the victim ended up under the rear tires of the fork lift as the scow at the front of the lift and the guards or barrier where the forks are located would not have permitted the plaintiff to pass

13

under the forklift if the collision with plaintiff occurred with the front of the vehicle.

An eye witness to the occurrence was one Daniel Ah San, also an employee of Star-Kist, who was on the dock monitoring the thawing scows of frozen fish destined for processing.

Ah San confirmed that the fork lift was operated in a slow fashion, and in his view, the operator's line of vision was affected by the cardboard box on the trash scow. He also testified however that while he was able to see the operator's head from where he was standing, he came to his conclusion about restricted vision in that he saw the operator stretch from side to side of the fork lift while it was moving. Further, he testified that he saw the left front side of the forklift hit the plaintiff who was then thrown to the ground and got his head caught between the wharf and the left boom of the forklift. He was eventually run over by the left wheel of the forklift before the driver stopped.

Prior to the collision, Ah San stated that he saw plaintiff walk from the eastern end of the dock along the shore side and then cross to the sami side. He continued walking past a stack of empty scows and then stopped to talk to person[s] aboard one of the vessels tied to the dock. While so engaged in conversation, he was struck by the fork lift.

### LIABILITY

We conclude on the facts that defendant's conduct at the time was wanting in the appropriate measure of care demanded in the circumstances. Forklifts are not in their nature instruments which may be operated with unrestricted vision, and accordingly, that extra degree of proper care is demanded of the operator. While we find that the operator's line of sight was not necessarily hampered by the load he was carting at the time, we do conclude that the operator failed to maintain a proper look out in the circumstances. We accept the evidence that the operator was showing more concern for the width of his load by stretching from side to side, needlessly forgoing complete attention to the direction of movement of the forklift. The operator testified that he did not see the plaintiff at all until he felt his rear

14

left tire being lifted off the ground. Further, the dock at the time was servicing vessels with parts of the dock reduced to narrow corridors because of the stacked rows of scows. It was just beyond a stack of these scows that the collision occurred and it appears to the Court that the plaintiff was probably hidden from the operator's view until nearing the end of the stacked row. Given the slowness of the operator's speed, proper attention could have avoided the accident.

On the other hand, the Court is not open to find that the proximate cause of injury is solely attributable to the fork lift operator. We conclude that plaintiff was also, in the circumstances, blameworthy, having failed to be sufficiently concerned with foreseeable risk attendant to the movement of machinery. Plaintiff, according to the evidence, is a seasoned fisherman and a ranking deck hand. Unloading and loading activities on a wharf should be familiar to him. That unlike the regulated flow of traffic on the highways, forklifts and like machinery on a dock are apt to move willy nilly from one point on the wharf to another. It goes without saying that a wharf servicing vessels with the necessary movement of machinery and equipment, is not the place for social discourse and casualness. Given the slowness of speed of the forklift, the court is equally unable to understand why the accident happened with plaintiff caught unaware, unless of course he was to that degree so rapt in conversation with others so as to render him completely unmindful of his locale, and the attendant risks involved with the locale.

We conclude and assess that proximate cause of injury was attributable as follows: plaintiff 40%, and the fork lift operator 60%. As there was no contention on the evidence about the operator being an employee of defendant Star-Kist Samoa, Inc., and acting at all relevant times within the scope of employment, the employer is liable for the negligent consequences of its employee's conduct.

## DAMAGES

The collision resulted in a number of injuries to plaintiff. He suffered facial lacerations and contusions, comminuted fractures to the left cheek bone (Zycoma) and part of the eye socket (floor, lateral and anterior wall of the left orbital).

15

Plaintiff also sustained a crushing injury to the rib cage causing a flail chest and was found to have a fracture of the left femur. X-Rays also indicated a fractured pelvis.

Upon admission to the L.B.J. Tropical Medical Center, plaintiff's lacerations were cleansed and repaired and a Steinman pin applied to his left knee area for traction pending surgery. He was placed in the Intensive Care Unit on a Ventilator because of his flail chest condition. After a week, plaintiff was weaned off the Ventilator to recommence breathing on his own. The doctor testifying, added that this initially was not without a lot of pain to the patient.

After sufficient chest recovery, plaintiff was required to undergo a number of surgical operations. Besides traction, treatment to plaintiff's leg necessitated open reduction with metallic fixation (K Rod). Dr. No'ovao of the Surgical Clinic testified that plaintiff was complaining of hip pains and he had rescheduled plaintiff for further surgery to have the metal rod removed.

Some two weeks after, plaintiff again went into the operating room in connection with his facial fractures. He had to undergo an open reduction of the orbital fractures and immobilisation with wire and packing.

By and large, recovery was remarkable. Dr. No'ovao's prognosis was as follows: with plaintiff's chest, the doctor testified that lung function was almost back one hundred per cent. Plaintiff's fractured ribs had healed completely and there was no evidence of fibrosis with lung tissues. Due to treatment, plaintiff's right shoulder was literally frozen from motion for a period of a month and initially causing movement limitations with his arm. He was now able to lift his arm without assistance and while there may be fibrositis scarring of the shoulder joint, movement will be fully restored. Plaintiff's leg injury was said to have healed nicely and movement was in the normal range. There was some slight pain experienced in plaintiff's hip area, but as noted above, this was due to the rod installed in plaintiff's leg and which would be removed.

16

Pelvic injuries had healed satisfactorily and in Dr. No'ovao's assessment these injuries should not contribute to any disability.

Some disability will remain however as a result of plaintiff's facial injuries. Treating physician, Dr. Saelua had plaintiff's recovery as good. Bone fractures and graft (to build up the floor of the eye socket and align the eyes) had healed. Plaintiff has sustained nerve injury which will affect sensation, and the ability to make facial expression. Further, facial muscles concerned will atrophy and cause facial loss of tone and shape. Additionally plaintiff has lost normal eye closure ability which together with his facial muscle restrictions, give him the appearance of a sunken eye. With residual eye closure especially, the left eye will have the tendency to dry up and be exposed to irritants. In the way of relief, plaintiff is prescribed artificial tears, however, in Dr. Saelua's assessment, the life of the fisherman with exposure to the sea and the elements was not recommended with plaintiff given his eye condition. Plaintiff is capable of resuming the life of manual work but he will need to seek employment in a sheltered environment.

Plaintiff was hospitalized at the L.B.J. Tropical Medical Center from April 20, 1987 until discharged on August 25, 1987, although his hospital records reveal that plaintiff was ready for discharge June 6, 1987, but continued to remain in hospital owing to placement difficulties.

Plaintiff's personal data are that he is 48 years of age, married with 3 children, and two of whom are minors. He has been associated with the fishing industry for some 17 years and was at the time of the accident a leading deckhand. The industry rates a person of plaintiff's experience at an earning scale of approximately $14,000.00 per annum.[1]

------

[1] Defendant Star-Kist did provide evidence to the contrary concerning plaintiff's specific circumstances. Plaintiff has been crewing on a vessel whose last voyages have not resulted in profit. The greater part of the itemized factors used to calculate income for plaintiff was said to be directly related to net fish proceeds. In

CONCLUSION

On the foregoing we assess damages as follows: for injuries, including pain and suffering, sustained, $80,000.00; for diminished earning capacity, $15,000.00; for medical costs $7,000.00; and for loss of earnings due to the accident $2,000.00.

In accordance with our finding of comparative negligence, total damages payable by Star-Kist Samoa, Inc., as the employer of the fork lift operator shall be $62,400.00.[2]

Judgment is entered accordingly, and it is so ORDERED.

---

case of plaintiff's vessel, this net figure has been a negative since plaintiff's recent employment.

[2] Plaintiff's cause of action against the vessel owner for maintenance and cure was not pursued here.